UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

SCOTT RICE,

        Plaintiff,

v.                                               Case No. 1:12-CV-1362

SUN LIFE AND HEALTH               HON. GORDON J. QUIST
INSURANCE COMPANY,

        Defendant.
_____/

**OPINION**

      Plaintiff, Scott Rice, has sued Defendants, Sun Life and Health Insurance Company (U.S.) (Sun Life) and the Benco Dental Supply Company Ltd. Plan (referred to individually as the Plan and collectively with Sun Life as Sun Life), under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, seeking to recover long-term disability (LTD) benefits under a group disability policy issued to Rice's former employer. Pursuant to the Amended Case Management Order entered on January 15, 2013, Sun Life has filed the Administrative Record and the parties have filed cross motions for judgment based upon the Administrative Record in accordance with *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998). For the reasons set forth below, the Court will grant Sun Life's motion, deny Rice's motion, and affirm Sun Life's denial of LTD benefits.

**I. BACKGROUND**

      Rice was employed by Benco Dental Supply as a Service Technician, which involved significant physical demands, including frequent standing, sitting, walking, pulling, and lifting of

up to fifty-five pounds and occasional lifting of over one hundred pounds. (104–09.)[1] During his employment with Benco, Rice was a participant in the Plan, which provided LTD insurance benefits under Sun Life group insurance policy number 057-5615-00 (Policy). (277–309.) The Policy defines disability as "either Totally Disabled or Partially Disabled." (287.) Total disability is defined as:

> Total disability must be caused by Sickness or Injury and must commence while you are insured under the policy. You will be considered Totally Disabled if:
> 1. During the Elimination Period and the following 24 months you are unable to perform all the material and substantial duties of your Regular Occupation.
> 2. After the Elimination Period and the following 24 months, you are unable to perform the duties of Any Occupation.

(*Id.*) The Policy also provides that "Proof" is "[a]ny information that is . . . [r]equired by [Sun Life] under the terms of the policy; and . . . [s]atisfactory to [Sun Life]." (286.)

Rice performed his job at Benco Dental Supply through June 12, 2009. (1366.) On or about July 17, 2009, Rice filed a claim with Sun Life for LTD benefits under the Policy, claiming that he was "unable to sit, stand or walk for long periods of time" due to "muscle, joint and nerve pain" in his back, arms, legs and neck caused by peripheral neuropathy. (1357, 1360.) Rice also claimed medication sensitivities and difficulty concentrating on daily activities with anxiety, muscle weakness, and tremors. (1360.)

Rice supported his application with a statement from his treating physician, R. Troy Carlson, M.D. Dr. Carlson stated that Rice had been diagnosed with "[p]rogressive neuropathy of upper [and] lower extremities," and that his symptoms had become progressively worse since 2007. (1358.) These symptoms included "sporadic and progressive numbness [and] weakness of legs" bilaterally, "generalized muscle fatigue [and] 'electrical' shocks impulses" in his extremities, and the sudden and unexpected inability to lift any weight at all. (327–28.) Dr. Carlson declined to

---

[1] Citations refer to pages of the Administrative Record in the CM/ECF Page ID# system.

specify any functional limitations, noting that he was "unable to determine [the] appropriate type of work due to progression of symptoms." (1358.) In June of 2009, Dr. Carlson had noted that in spite of "extensive blood and diagnostic testing," and multiple evaluations by neurologists and physiatrists who objectively documented Rice's loss of neural function, "no physician including myself has been able to successfully diagnose and treat Scott's progressing condition." (1350.)

On September 22, 2009, Sun Life approved Rice's application for LTD benefits based on his inability to perform his own occupation of Service Technician. (1243–44.) Sun Life notified Rice that benefits would be paid for two years, after which he would be required to show that he was disabled from performing the duties of any occupation for which he was qualified. (1243.) Sun Life paid Rice benefits for the duration of the own occupation period and for an additional eight months, through April 2012.

In May 2012, Sun Life retained MES Solutions to review Rice's file to determine Rice's continuing eligibility for LTD benefits. MES referred the file to Siva Ayyar, M.D., Board Certified in Occupational and Preventative medicine, to review the file. In addition to reviewing Rice's records, Dr. Ayyar spoke with Dr. Carlson's office. (975.) Based on his review, Dr. Ayyar concluded that as of September 2011 (when the any occupation period commenced), Rice was not disabled from performing a sedentary occupation. (911.) Dr. Ayyar noted that Rice exhibited "relatively well-preserved neurological function on multiple occasions" and a "non-focal neurological exam on at least one occasion," had 5/5 strength in the bilateral upper and lower extremities on multiple occasions in 2009, was ambulatory, and engaged in camping, fishing, and exercising regularly—activities that were inconsistent with his stated capacity. (ID 912.) Dr. Ayyar observed that Rice's symptoms were "sporadic and irregular" and that some clinical findings were consistent with peripheral neuropathy, while others were not. Dr. Ayyar continued:

> The claimant is described as exhibiting normal serological function on multiple occasions referenced above in March and June 2011. He is described as exhibiting normal white count, normal hemoglobin A 1c, slightly elevated cholesterol panel, etc., on multiple occasions referenced above. These findings suggest that the claimant is both hemodynamically and serologically stable. He has no clinically significant electrolyte derangement, anemia, or hypothyroidism that might account for his symptoms. His thyroid function has been treated to resolution with Levoxyl.

(912.) Dr. Ayyar did note that electrodiagnostic studies confirmed peripheral polyneuropathy, but the condition was "sensory polyneuropathy with symptoms of pain, paresthesias, numbness, and dysesthesia" that did not produce any overt motor deficits. (913.) Finally, Dr. Ayyar stated that restrictions of "[n]o standing or walking greater than one-hour continuously, maximum four hours per eight hour work day," might be appropriate at times when Rice was symptomatic. (913.)

After Dr. Ayyar completed his initial report, Dr. Carlson's office contacted Dr. Ayyar to confirm that "Dr. Carlson does believe that claimant could do sedentary work, both in the past and going forward." (975.) Dr. Carlson also indicated that Rice would need the option to stand and move around to relieve his symptoms. (*Id.*) Dr. Ayyar confirmed that the new information did not change his prior opinion. (*Id.*)

On May 24, 2012, Sun Life notified Rice of its decision that he no longer qualified for LTD benefits under the Policy. (1387.) In its decision letter, Sun Life referred to Dr. Ayyar's report, as well as a vocational consultant's assessment, which identified Dispatcher, Maintenance Service, as a sedentary occupation that met Rice's physical restrictions and qualifications. Sun Life concluded that because Rice failed to submit proof establishing that he was disabled from performing the duties of any reasonable occupation, he was no longer entitled to benefits. Finally, Sun Life acknowledged that Rice had previously obtained Social Security Disability (SSD) Benefits, but noted that the Social Security Administration's (SSA) "decision may not have taken into consideration the updated medical and vocational information presently contained in [Sun Life's] file." (1394.)

Rice appealed Sun Life's decision as permitted by ERISA. As part of its review of the appeal, Sun Life retained Donald Harrell, M.D., Board Certified in Occupational Medicine, to

4

perform an independent medical examination of Rice. Dr. Harrell examined Rice for approximately two hours on September 12, 2012. Dr. Harrell reported that Rice "remained seated in the molded plastic (desk-type) chair next to the exam room desk, for direct physician history taking, lasting from 8:10 AM till about 10:20, without evident distress or interruption," and that Rice "sat quietly without significant repositioning for most of the exam." (184.) Based on his examination and review of Rice's records, Dr. Harrell concluded that Rice was capable of lifting up to thirty pounds, frequently lifting fifteen pounds, pushing or pulling fifty pounds, sitting eight hours in an eight hour day, and standing and walking four hours each in an eight hour day. (198–99.) Dr. Harrell found no evidence of functional impairment relating to sitting or standing and no evidence that Rice was impaired in the use of his upper extremities, for example to operate a keyboard or use a telephone. (200.) Dr. Harrell stated that electromyogram/nerve conduction studies were supportive but not definitive of polyneuropathy of the upper and lower extremities, and he noted that the clinical data and objective examination findings did not correlate with Rices's subjective complaints of pain. (199–200.)

Sun Life also forwarded Rice's medical records to Phillippe Chemaly, Jr., D.O., Board certified in Physical Medicine and Rehabilitation, for a file review.[2] Dr. Chemaly noted that "[o]verall the medical file supports the claimant is independent with [activities of daily living] and ambulating without assistive device, with widely varying subjective complaints." (165.) Dr. Chemaly stated that when Rice was symptomatic—occurring two to three days per week—he would be able to stand and walk for up to one hour at a time, for a total of four hours in an eight hour day, and at all other times he could stand and walk for up to two hours at a time for a total of four to six hours in an eight hour day. Dr. Chemaly further opined that Rice could lift, push, pull, and carry up to thirty pounds infrequently and up to fifteen pounds occasionally, and that he could lift one to

---

[2] Sun Life also arranged a file review by Adam Ameele, a licensed psychologist, to opine on whether Rice has psychological impairments that render him disabled. (143–47.) Dr. Ameele concluded that Rice was not disabled by a psychological condition. Dr. Ameele's opinion is irrelevant to whether Rice is disabled because, as Rice acknowledges, he is not claiming disability due to a psychological impairment. (Pl.'s Br. Supp. at 8.)

5

two pounds frequently. Finally, Dr. Chemaly concluded that Rice's reports of pain during prolonged sitting were unsupported. (*Id.*)

On November 13, 2012, Sun Life issued a written determination to Rice denying his appeal. (134–42.) In support of its denial, Sun Life noted that Rice's reported activities of camping, fishing, and riding an off-road vehicle in the sand, and Rice's statement during a psychiatric consult that he did not ride his off-road vehicle in the woods more often due to the lack of places to do so, rather than due to his impairment, suggested increased functional abilities. (139.) Sun Life also cited Dr. Harrell's findings on examination of Rice, as well as Dr. Chemaly's conclusions, which established that Rice's impairments would not preclude him from performing sedentary work activities. (139–41.) While Sun Life acknowledged that Dr. Harrell had made treatment recommendations, it nonetheless stated that "the examination findings did not show functional impairments that would not [sic] preclude sedentary work activities as Dr. Harrell concluded that functional limitations relating to sitting and upper extremity use were not demonstrated on exam." (140.) Finally, Sun Life acknowledged Rice's SSD benefits award, but cited reasons for reaching a different result. (142.)

## II. DISCUSSION

### *Standard of Review*

Generally, in an ERISA case, a court reviews a denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989); *see also Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998). However, a court employs a deferential standard of review if "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S. Ct. at 956–57; *see also Cox v. Standard Ins. Co.*, 585 F.3d

6

295, 299 (6th Cir. 2009) ("When the plan gives the administrator discretionary authority, we apply the highly deferential arbitrary and capricious standard.").

Two issues regarding the appropriate standard of review are present in this case: (1) whether the Plan contains the necessary clear grant of discretion requisite to application of the arbitrary and capricious standard, *see Perez*, 150 F.3d at 555; and (2) if the Plan contains a discretionary provision, whether Michigan Administrative Code Rule 500.2202(b), which prohibits provisions granting discretionary authority to insurance companies in group insurance policies issued after July 1, 2007, bars enforcement of the discretionary provision. *See Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 608-09 (6th Cir. 2009) (holding that ERISA does not preempt Michigan Administrative Rules prohibiting discretionary clauses).

As to the first issue, Sun Life cites the following language:

> Sun Life and Health Insurance Company (U.S.), as Claims Fiduciary, shall have the sole and exclusive discretion and authority to carry out all actions involving claims procedures explained in the Policy. The Claims Fiduciary shall have the sole and exclusive discretion and power to grant and/or deny any and all claims for benefits, and construe any and all issues relating to eligibility for benefits. All findings, decisions, and/or determinations of any type made by the Claims Fiduciary shall not be disturbed unless the Claims Fiduciary has acted in an arbitrary and/or capricious manner. . . .

(309.) Rice does not dispute that this language constitutes a clear grant of discretion. Instead, he argues that it does not apply because it is not part of the Policy, which Rice contends is the pertinent document for purposes of ERISA. Although the quoted language appears as part of the ERISA Rights language rather than within the Policy itself, Rice cites no authority for the proposition that an ERISA plan may consist of only one document, and the Court finds no reason to conclude that the ERISA Rights provisions are not part of the Plan. *See Pettaway v. Teachers Ins. & Annuity Ass'n of Am.*, 644 F.3d 427, 433 (D.C. Cir. 2011) (noting that "ERISA's statutory text suggest that multiple plan documents can be legally relevant" and that "the ERISA sections on fiduciary

responsibilities imply that there will be multiple legally important plan documents"). Moreover, the Policy itself requires that proof of disability be "[s]atisfactory to [Sun Life]." (257.) As the Sixth Circuit has observed, "[t]his Court has found 'satisfactory proof,' and similar phrases, sufficiently clear to grant discretion to administrators and fiduciaries." *Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 567 (6th Cir. 2013) (citing *Perez*, 150 F.3d at 556, and *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir. 1991)). In light of this language, the Policy itself contains a sufficiently clear grant of discretion.

As for the application of Michigan's administrative rule prohibiting discretionary clauses, the Court concludes that such rule does not apply to the Policy because the Policy states that it was issued in Rhode Island and is governed by the laws of that state. There is no indication in the administrative record that the Policy was issued or delivered in Michigan, and Rice does not contend otherwise. Courts in both this district and the Eastern District of Michigan have held that when, as in this case, a group insurance policy is neither issued nor delivered in Michigan and is governed by the laws of another state, Michigan Administrative Code Rule 500.2202(b) does not apply. *Williams v. Target Corp.*, No. 12-cv-11775, 2013 WL 5372877, at *2 (E.D. Mich. Sept. 25, 2013) (concluding that the "Michigan anti-discretionary clause regulation does not bar the grant of discretionary authority in the 2010 Policy, because that Policy was not issued or delivered in Michigan"); *Foorman v. Liberty Life Assurance Co. of Boston*, No. 1:12-CV-927, 2013 WL 1874738, at *3 (W.D. Mich. May 3, 2013) (holding that Michigan's anti-discretionary clause rule did not apply because the group disability insurance policy was not issued or delivered in Michigan and a conflict-of-law analysis compelled application of Pennsylvania law); *Grimmett v. Anthem Ins. Cos., Inc.*, No. 2:11-cv-12623, at *9 (E. D. Mich. Sept. 27, 2012) (concluding that the policy's Indiana choice of law provision governed and precluded application of Michigan's rule prohibiting

8

discretionary clauses). The Court finds the reasoning in these cases persuasive and, thus, concludes that Michigan's anti-discretionary clause rule likewise does not apply in this case.[3]

The arbitrary and capricious standard "'is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'" *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (citation omitted) (quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985)); *see also Miller*, 925 F.2d at 984 (noting that administrators' decisions "are not arbitrary and capricious if they are 'rational in light of the plan's provisions'") (quoting *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988)). Although the standard is highly deferential, it still requires "some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). Thus, a court must do more than merely rubber stamp the administrator's decision. *Id.* The decision must be upheld, however, "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 501 (6th Cir. 2010) (internal quotation marks omitted).

### *Sun Life's Denial of Benefits*

In reviewing a plan administrator's denial of benefits, "the ultimate issue . . . [for the court] is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002). Rice contends that Sun Life's acceptance of the opinions of its hired consultants over those of Rice's treating physicians, Sun Life's inherent

---

[3] Even if Michigan law applied to the Policy, the anti-discretionary clause rule would still not preclude application of the arbitrary and capricious standard because the Policy was issued before July 1, 2007—the effective date of the rule—and was not revised after that time. *See* Mich. Admin. Code R. 500.2202(b)–(c).

conflict of interest, and the award of Social Security Disability Benefits estops Sun Life from concluding that Rice is not disabled.

**A.     Sun Life's Decision is Supported by Substantial Evidence**

Under the arbitrary and capricious standard, when a plan administrator provides a reasoned explanation, based on the evidence, for its decision to deny a claim for benefits, a court must defer to the decision "so long as it is rational in light of the plan's provisions." *Frazier*, 725 F.3d at 567 (citing *Miller*, 925 F.2d at 984).  In light of the record, the Court cannot say that Sun Life's decision was unreasonable or irrational.  Sun Life's decision is supported by the following:

- The opinions of two independent reviewers (Drs. Ayyar and Chemaly) who acknowledged clinical support for a diagnosis of polyneuropathy and some level of impairment when Rice was symptomatic with pain, but found no basis for limitations that would preclude Rice from performing full-time sedentary work (165, 880–82);

- An IME by Dr. Harrell, who noted that Rice sat in a chair for well over an hour during the examination without evident distress or interruption or the need for significant repositioning, and found no specific functional impairments as to sitting or standing or use of the upper extremities (184, 199–200);

- Rice's reported activities of camping, fishing, exercising, and riding an off-road vehicle in the sand that were inconsistent with Rice's claimed limitations (139, 912); and

- A statement from Rice's treating physician, Dr. Carlson, that Rice was always capable of performing sedentary work, although his condition would require that such work afford him the opportunity to get up and move around, at times, to relieve his symptoms (975).

Moreover, there is no indication that Sun Life ignored or misconstrued any of the medical evidence Rice submitted in support of his claim.  In fact, Sun Life explained in its written denial letters why such evidence failed to support his claim.

Rice contends that selected portions of Dr. Harrell's report and Dr. Chemaly's report support his claim.  There is some merit to this assertion, but read as a whole, the doctors' reports

unquestionably conclude that Rice was not functionally impaired from performing sedentary work. For example, Dr. Harrell stated that clinical studies supported a diagnosis of polyneuropathy, that Rices's current pharmacological treatment was inadequate, and that with treatment from a physical therapist and an occupation therapist Rice could return to work within six to twelve months. However, he also concluded that Rice was not functionally impaired in sitting, standing, or using his upper extremities.  (199-200.)  Moreover, Dr. Harrell found that "[t]he <u>clinical data</u> and <u>objective examination</u> findings do not correlate to the subjective complaints of the examine." (200 (emphasis in original).)  Similarly, Dr. Chemaly found that Rice was suffering from "upper extremity paresthesias and lower extremity paresthesias in a stocking and glove pattern" indicative of polyneuropathy that was "functionally impairing," but he concluded that even when Rice was symptomatic, he could still stand and walk up to one hour at a time, with a total time of four hours in an eight-hour day.  (165.)  In short, the gravamen of Rice's argument appears to be that his diagnosis of polyneuropathy, alone, suffices to establish disability.  As courts have recognized, however, a "medical diagnosis [by itself] does not establish a disability." *Jordan v. Northrop Grumman Corp.*, 370 F.3d 869, 880 (9th Cir. 2004), *overruled on other grounds by Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 969 (9th Cir. 2006).  Instead, Rice was required to demonstrate that his medical condition precluded him from working any occupation. *See Herring v. Aetna Life Ins. Co.*, 898 F. Supp. 2d 1313, 1317 (S.D. Fla. 2012).  In this regard, Sun Life was not required to accept Rice's subjective complaints of pain, which were not supported by the objective medical evidence in the record.

      Rice contends that the Court should reverse Sun Life's determination because Sixth Circuit precedent favors the opinions of the claimant's treating physicians over the opinions of the plan administrator's hired consultants who merely perform a "cold" review of the record.  This contention, however, is not entirely accurate.  A plan administrator is not required to defer to a

11

treating physician's opinion, *see Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 1972 (2003), but it must give reasons for adopting an alternative opinion. *See Evans v. UnumProvident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006). While in some cases the Sixth Circuit has criticized the decisions of plan administrators to opt for file reviews in lieu of physical examinations, *see, e.g.*, *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006); *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 509 (6th Cir. 2005); *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2008), it has also noted that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Calvert*, 409 F.3d at 296. Whether a plan administrator's reliance on a file review should be rejected depends on the particular circumstances of the case. The Sixth Circuit "has found fault with file-only reviews in situations where the file reviewer concludes that the claimant is not credible without having actually examined him or her," or "when the plan administrator, without any reasoning, credits the file reviewer's opinion over that of a treating physician." *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013).

In the instant case, Sun Life did not abuse its discretion by accepting the opinions of Drs. Ayyar, Harrell, and Chemaly, all of whom concluded that Rice had no impairment that precluded him from performing a sedentary job. In rendering their opinions, neither Dr. Ayyar nor Dr. Chemaly—who conducted file-only reviews—purported to assess Rice's credibility. Rather, both doctors simply noted that Rice's subjective complaints of pain were not supported by objective evidence. As for Dr. Harrell, he actually examined Rice and concluded, based on his own observations and his review of the records, that Rice's claim that sitting exacerbated his condition was unsupported and that Rice was otherwise able to engage in activity consistent with sedentary work. Moreover, Sun Life gave adequate reasons for accepting the opinions of its consulting physicians. And, although Dr. Carlson repeatedly certified that Rice was disabled, Dr. Carlson's

statement that Rice was always capable of performing sedentary work undermined his conclusion that Rice was disabled.

**B.     Sun Life's Inherent Conflict of Interest Provides No Basis for Reversal**

In applying the arbitrary and capricious standard, a court must consider and evaluate potential conflicts of interest that may affect the plan administrator's decision. *See Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006), *aff'd* 554 U.S. 105, 128 S. Ct. 2343 (2008). Sun Life has a conflict of interest because it both reviews and pays claims. *See id.* A conflict of interest does not change the standard of review, but is simply one consideration a court weighs in applying the arbitrary and capricious standard. *Smith v. Continental Cas. Co.*, 450 F.3d 253, 260 (6th Cir. 2006). A conflict of interest carries more than only some weight, however, when there is "significant evidence in the record that the insurer was motivated by self-interest, and the plaintiff bears the burden to show that a significant conflict was present." *Id.* For example, a court may accord a conflict of interest greater weight where there is evidence that "an insurance company administrator has a history of biased claims administration." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117, 128 S. Ct. 2343, 2351 (2008). A court should give the conflict of interest factor more weight when "the claimant offers more than conclusory allegations of bias." *Judge*, 710 F.3d at 664 (internal quotation marks omitted).

In this case, Rice raises Sun Life's conflict of interest but fails to offer anything of substance to justify according this factor more than minimal weight. The record shows that Sun Life fully considered Rice's medical evidence, conducted a thorough review, including an in-person examination, and gave good reasons for denying Rice's claim.

**C.     The Award of SSD Benefits Does Not Preclude Sun Life's Denial of Benefits**

"A determination that a person meets the Social Security Administration's . . . uniform standards for disability benefits does not make her automatically entitled to benefits under an ERISA

13

plan, since the plan's disability criteria may differ from the SSA's criteria." *Allen v. Life Ins. Co. of Am.*, 504 F. App'x 435, 439 (6th Cir. 2012) (citing *Whitaker v. Hartford Life & Accident Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005)). However, the Sixth Circuit has held that

> if the plan administrator (1) encourages the applicant to apply for Social Security disability benefits; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on a question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary or capricious.

*Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008) (citing *Glenn*, 461 F.3d at 669). Thus, a plan administrator's *failure to explain* a decision contrary to an SSA decision may be indicative of an arbitrary and capricious determination. *Bennett*, 514 F.3d at 553 n.2 (stating that "mere mention of the decision is not the same as a discussion about why the administrator reached a different conclusion from the SSA").

In the instant case, although Sun Life apparently encouraged Rice to apply for SSD benefits and financially benefitted from the award, Sun Life did not arbitrarily ignore the award, but instead offered an adequate explanation for reaching a different result. That is, Sun Life noted that the Policy's conditions for an award of LTD benefits were not necessarily consistent with those for receiving SSD benefits, and the SSA did not have the same information Sun Life had before it at the time it made its decision to deny LTD benefits.

### III. CONCLUSION

For the foregoing reasons, the Court will grant Sun Life's motion for judgment on the administrative record and deny Rice's motion for judgment on the administrative record.

An Order consistent with this Opinion will be entered.

Dated: January 2, 2014 /s/ Gordon J. Quist
GORDON J. QUIST
UNITED STATES DISTRICT JUDGE